**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Randall Hockensmith,             :
                                      :     Case No. 1:11-cv-173
                                        :
                Plaintiff,     :
                                        :
                v.               :
                                        :
Fifth Third Bank,             :
                                        :
                 Defendant.    :

## O R D E R

This matter is before the Court on Plaintiff Randall Hockensmith's motion for summary judgment (Doc. No. 37), Magistrate Judge Bowman's Report and Recommendation that Plaintiff's motion for summary judgment be granted (Doc. No. 48), Defendant Fifth Third Bank's objections to the Report and Recommendation (Doc. No. 50), and Plaintiff's response to Defendant's objections (Doc. No. 54).  For the reasons that follow, Fifth Third's objections to the Report and Recommendation are well-taken and are **SUSTAINED.**  The Court does not adopt the Report and Recommendation. Plaintiff's motion for summary judgment is not well-taken and is **DENIED.**

## I. Background

The dispute in this case centers on three vintage and very valuable Chevrolet Corvette automobiles, a 1967 project 435 Corvette, VIN# 194677S106186, a black 1967 Corvette Coupe, VIN# 194377S100405, and a white 1967 Corvette convertible, VIN# 194377S117307.  The rival claimants for these cars are Plaintiff Randall Hockensmith, a

1

citizen of Florida, and Defendant Fifth Third Bank ("Fifth Third"), a bank organized under the laws of the State of Ohio.  Amended Complaint (Doc. No. 12) ¶¶ 1, 2.  The other important entity in this case is Performance Plus Motor Sports, Inc. ("Performance Plus"), which was a corporation formerly in the business of buying, restoring, and selling automobiles, particularly Corvettes.  Id. ¶ 3.

Fifth Third provided floor plan financing to Performance Plus under an agreement dated August 3, 2007.  Doc. No. 41-1, at 3 ("Master Secured Promissory Note").  As collateral for the loan, Performance Plus gave Fifth Third a security interest in a number of assets, including its inventory.  Doc. No. 41-1, at 6 ("Dealer Floor Plan Agreement"). The Floor Plan Agreement defines "inventory" as:

> all now owned, or hereafter acquired, goods, supplies, wares, merchandises [sic], and other tangible personal property, including raw materials, work in progress, supplies and components, and finished goods, including but not limited to all new and used automobiles, trucks, vans and other motor vehicles, and all parts, accessories, additions or accessions thereto, whether held for sale or lease, or furnished or to be furnished under any contract for service, or used or consumed in business, and also including rents, issues, proceeds, products of and accessions to inventory, packing and shipping materials, and all documents of title evidencing any of the foregoing, whether negotiable or non-negotiable, representing any of the foregoing.

Id. at 7, § 2(d).  Fifth Third filed a U.C.C.-1 financing statement perfecting its security interest in Performance Plus's inventory on August 3, 2007.  Doc. No. 41-1, at 17-24.

Plaintiff is a self-described collector of classic and exotic automobiles.  Doc. No. 37-1 (Hockensmith Affidavit) ¶ 1.  Although Plaintiff calls his car collecting activities a hobby, his affidavit and deposition reflect that he had an informal but nevertheless tangible business relationship with Performance Plus with respect to Corvettes.  Noel Grace, the president of Performance Plus, would identify Corvettes he thought Plaintiff

would be interested in buying.  Plaintiff would send funds to Performance Plus, who would then buy the Corvette on his behalf.  Performance Plus would restore the Corvette to Plaintiff's specifications and then Performance Plus would sell the Corvette to another buyer on Plaintiff's behalf.  Plaintiff and Performance Plus would split any profits resulting from the sale.  Performance Plus usually retained Plaintiff's profits so they could be rolled into the purchase of another Corvette.  On other occasions, Plaintiff and Performance Plus would simply trade one Corvette for another Corvette, or for another Corvette and cash.  Id. ¶ 3-7; Plaint. Dep. (Doc. No. 41-4), at 36-38.  The rather ad hoc nature of the dealings between Plaintiff and Performance Plus is reflected in the convoluted provenance of the three Corvettes at issue in this case.  See Amended Complaint ¶¶ 10-36 (reflecting an extended series of purchases, restorations, sales or trades which culminated in the acquisitions of the three Corvettes).

There are several noteworthy aspects of the relationship between Plaintiff and Performance Plus.  First, the Corvettes were usually titled to Performance Plus, instead of Plaintiff, because that made it easier for Performance Plus to enter the Corvettes into competitions.  Plaintiff Aff. ¶ 4.  Second, once the restoration of a car was completed, it was available for sale or trade at Performance Plus.  Id.  Third, Plaintiff authorized Performance Plus to buy, sell, or barter the cars on his behalf, albeit Performance Plus normally obtained Plaintiff's consent before concluding a transaction.  Id. ¶ 8.

Performance Plus defaulted on its floor plan agreement with Fifth Third on or about August 2, 2009.   At around this time, Grace informed Plaintiff that Fifth Third "was systematically putting him [Grace] out of business over his floor plan[.]" Plaint. Dep. at 9.  The Corvettes involved in this case were titled to Performance Plus at this

3

time and were located on its premises.  Plaintiff instructed Grace to transfer the titles to

the three Corvettes to him immediately and move them from Performance Plus's

property because "when they [Fifth Third] come in they're going to want everything and I

don't want them having what's mine."  Id. at 10; Plaintiff Aff. ¶ 12.  Grace transferred the

title to the three Corvettes to Plaintiff on August 10, 2009.  Id.; see also Doc. Nos. 37-4,

37-6, 37-8 (Plaint. Exs. D, F, & H ), Certificates of Title.

Grace, however, did not move the Corvettes from Performance Plus's property.[1]

Fifth Third obtained a judgment against Performance Plus on October 26, 2009.  Doc.

No. 41-1 (Sesler Aff.) ¶ 9).   On December 21, 2009, Fifth Third executed its judgment

against Performance Plus.  The sheriff entered Performance Plus's property and seized

all the personal property there, including the three Corvettes.  Id. ¶ 10.  Plaintiff

demanded that Fifth Third return the Corvettes to him, but Fifth Third has refused.

Plaint. Aff. ¶ 14.

Plaintiff filed suit against Fifth Third in March 2011, asserting state law claims for

replevin, conversion, and civil theft of the Corvettes.  Fifth Third answered and filed

counterclaims asserting that it has perfected security interests in the Corvettes and that

Performance Plus's transfers of the Corvettes to Plaintiff violated its rights as a secured

creditor.  Fifth Third, therefore, seeks a judgment that it is entitled to liquidate the

Corvettes and apply the proceeds to the obligations owed to it by Performance Plus.

---

[1]     Fifth Third asserted during oral argument, and again in its objections to the
Report and Recommendation, that Performance Plus moved the Corvettes off of its
place of business and into an off-site storage location.  Fifth Third, however, did not
provide a record citation to support this assertion. Nevertheless, even if true, it is
undisputed that the Corvettes remained either in Performance Plus's and/or Noel
Grace's custody and control after the default.

The Court has subject matter jurisdiction over this matter because the parties are diverse and the amount in controversy exceeds $75,000.

Following the close of discovery, Plaintiff filed a motion for summary judgment on each of his claims and on Fifth Third's counterclaims.  Plaintiff also seeks an order directing his immediate possession of the three Corvettes.  Plaintiff's motion for summary judgment has been fully briefed and is ready for disposition.

## II. Summary Judgment Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992).  Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Ind. Co. v.

5

Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court construes the evidence

presented in the light most favorable to the non-movant and draws all justifiable

inferences in the non-movant's favor.  United States v. Diebold, Inc., 369 U.S. 654, 655

(1962).

      The court's function is not to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S.

at 249.  The court must assess "whether there is the need for trial — whether, in other

words, there are any genuine factual issues that properly can be resolved only by a

finder of fact because they may reasonably be resolved in favor of either party."  Id. at

250.  "If the evidence is merely colorable, . . .  or is not significantly probative, . . . the

court may grant judgment."  Anderson, 477 U.S. at 249-50 (citations omitted).

### III. Analysis

      Although a number of legal theories are at play in this case, the basic and

dispositive issue in the case is whose interest in the Corvettes is superior, Fifth Third's

or Plaintiff's.  Plaintiff contends that he was a buyer in the ordinary course of business of

the Corvettes, thus terminating any security interest Fifth Third had in the Corvettes,

and/or that his certificates of title to the cars conclusively demonstrate his ownership of

and superior interest in the cars.  Fifth Third contends that Performance Plus's transfer

of the titles of the cars to Plaintiff was fraudulent and done in an effort to defeat its rights

as a creditor.  Fifth Third argues that its interest in the Corvettes is superior to Plaintiff's

due to its perfected security interest in Performance Plus's inventory.  Plaintiff responds

that Fifth Third never perfected its interest in the Corvettes because notations of its

6

security interests were never made on the certificates of title.

        A. <u>The Ohio Certificate of Motor Vehicle Title Law Does Not Apply</u>

Plaintiff first argues the Certificate of Motor Vehicle Title Act supplants Ohio's version of the Uniform Commercial Code and controls the issue of competing claims to ownership of motor vehicles.  Plaintiff's position, therefore, is essentially that the issuance of the certificates of title in his name conclusively establishes his ownership of the Corvettes.  Plaintiff relies principally on <u>Saturn of Kings Automall v. Mike Albert Leasing, Inc.</u>, 751 N.E.2d 1019 (Ohio 2001), to support his position.  Fifth Third contends that <u>Saturn of Kings Automall</u> does not apply in this case because it is not asserting ownership of the Corvettes.  Rather, Fifth Third contends that it is enforcing its security interest in Performance Plus's inventory by seizing the Corvettes.

<u>Saturn of Kings Automall</u> involved a true ownership dispute over automobiles.  In the case, Saturn of Kings Automall entered into an agreement to sell five cars to Gallatin Auto Sales.  Saturn delivered the cars to Gallatin, but withheld the certificates of title pending receipt of payment from Gallatin.  Gallatin then purported to sell two of the cars to Mike Albert Leasing, Inc.  Gallatin delivered the cars to Mike Albert and Mike Albert tendered the purchase price to Gallatin.  Gallatin, however, did not pay over any money from the sale to Mike Albert to Saturn.  Gallatin, therefore, could not provide titles to the cars to Mike Albert.  751 N.E.2d at 1020.   Saturn filed suit against Gallatin and Mike Albert for replevin and conversion of the cars while Mike Albert filed a counterclaim alleging that it had lawfully bought the cars from Gallatin and thus sought an order compelling Saturn to deliver the certificates of title.  <u>Id.</u>

The trial court ruled that the Ohio Certificate of Motor Vehicle Title Act, Ohio

7

Revised Code § 4505.04, applied in the case.  Generally speaking, § 4505.04 provides

that no person can have an ownership interest in a motor vehicle until a certificate of

title to the motor vehicle is issued to him.  Allan Nott Enter., Inc. v. Nicholas Starr Auto,

L.L.C., 851 N.E.2d 479, 482 (Ohio 2006) ("R.C. 4505.04 provides that a person must

possess a certificate of title to claim ownership of a motor vehicle.").  Because Saturn

had never transferred the titles to the cars to Gallatin, the trial court ruled that Gallatin

had no ownership rights in the cars, and, consequently, could not pass good titles to

Mike Albert.  Saturn of Kings Automall, 751 N.E.2d at 1020-21.  The trial court, therefore,

granted summary judgment in favor of Saturn.

     The court of appeals, however, held that the trial court should have determined

ownership of the cars according to the Uniform Commercial Code ("U.C.C.").  Id. at

1021.  The court of appeals concluded that Saturn had entrusted the cars to Gallatin

pursuant to Ohio Rev. Code § 1302.44(B).  Section 1302.44(B) authorizes a merchant

in goods of the kind to transfer the entruster's title to a buyer in the ordinary course of

business.  The court of appeals determined that there were genuine issues of fact

whether Mike Albert was a buyer of the automobiles in the ordinary course of business

and remanded the case for further proceedings.  Id. at 1021.

     On further appeal by Saturn, the Supreme Court of Ohio addressed the issue

whether a person can acquire legal ownership of a motor vehicle without a transfer of

the certificate of title to that person.  Id.  The Court noted further that resolution of this

question depended on the interplay between the U.C.C. and the Certificate of Motor

Vehicle Title Act.  Id.  The Court then surveyed its prior cases addressing conflicts

between the U.C.C. and the Certificate of Title Act, the details of which are

8

inconsequential here.  Id. at 1022-24.  The upshot of the Court's review of its case law

was that "R.C. 4505.04 was intended to apply to litigation where the parties were rival

claimants to title, i.e., ownership of the automobile."  Id. at 1024 (emphasis added); see

also id. at 1025 ([W]e hold that in determining competing claims of ownership of a motor

vehicle, R.C. § 4505.54 controls over the provisions of the Uniform Commercial Code.").

 Thus, like the trial court, the Supreme Court of Ohio concluded that Gallatin could not

pass good titles to the cars to Mike Albert because it had never obtained good titles

from Saturn.  Id. at 1025.  The Court ruled that Saturn was the owner of the cars

because it retained the titles to them.  Id.

        Saturn of Kings Automall, however, does not apply because Fifth Third is not

claiming ownership of the Corvettes.  As stated above, Saturn of Kings Automall

involved a true dispute concerning ownership of the automobiles.  In this case, however,

Fifth Third is not claiming that it owns the Corvettes.  Rather, Fifth Third's position is that

it is attempting to foreclose a security interest in the Corvettes that was perfected in

Performance Plus's inventory.  And indeed, in a subsequent case, the Ohio Court of

Appeals concluded that Saturn of Kings Automall does not mean that all disputes

involving liens are resolved by the Certificate of Motor Vehicle Title Act.  See Heartland

Bank v. National City Bank, 869 N.E.2d 746, 754 (Ohio Ct. App. 2007).   In fact, the

Court in Heartland held that questions concerning the perfection and priority of a

security interest in an automobile dealer/debtor's inventory is controlled by the U.C.C.,

not the Certificate of Motor Vehicle Title Act.  Id. at 755 ("[A]s to the perfection and

priority of security interests in motor vehicles held as inventory by a dealer, RC Chapter

1309 controls.").  Thus, in this case, resort to the Certificate of Motor Vehicle Title Act

9

does not resolve the issue whether Fifth Third has a valid and enforceable security interest in the Corvettes.  Therefore, as stated, <u>Saturn of Kings Automall</u> does not apply.

B. <u>A Reasonable Juror Could Conclude That Fifth
Third Has a Perfected Security Interest in the Corvettes</u>

Plaintiff argues that Fifth Third does not have a security interest in the Corvettes because there is no notation of its lien on the certificates of title.  Plaintiff is generally correct that the Certificate of Motor Vehicle Title Act requires a security interest in a motor vehicle to be perfected by either noting the lien on the title itself or by electronically entering the lien with the clerk of court.  Ohio Rev. Code § 4505.13(B); <u>In re McAlmont</u>, 385 B.R. 191, 195 (Bkrtcy. S.D. Ohio 2008) (stating that a security interest in a motor vehicle may only be perfected by complying with the Certificate of Motor Vehicle Title Act).  The court in <u>McAlmont</u> specifically noted that a security interest in a motor vehicle cannot be perfected merely by filing a financing statement.  385 B.R. at 195 ("Under Ohio law, the filing of a financing statement does <u>not</u> result in the perfection of a security interest in goods - such as the Debtor's motorcycle - that are subject to Ohio's certificate of title statute.") (emphasis in original).

As Fifth Third correctly argues, however, the certificate of title act provides an exception when a motor vehicle is being held as inventory.  Section 4505.13(A)(2) provides that the perfection provisions of Chapter 1309 apply when a dealer holds a motor vehicle as inventory.  Furthermore, this section provides that neither a notation of the security interest on the certificate of title nor a electronic notation by the clerk of court is required to perfect a security interest in a motor vehicle held as inventory.

 Stated more specifically, if a motor vehicle is being held as inventory by a

10

dealer, the perfection provisions of Chapter 1309 prevail over the perfection provisions of the certificate of title act. <u>See</u> <u>Heartland</u>, <u>supra</u>, at 755. Therefore, if a motor vehicle is being held as inventory by a dealer, a creditor may perfect its security interest in the motor vehicle by filing a U.C.C. financing statement on the debtor's inventory. <u>See</u> Ohio Rev. Code § 1309.311(D), and Comment 4 ("Compliance with a certificate-of-title statute is both unnecessary and ineffective to perfect a security interest in inventory to which this subsection applies. Thus, a secured party who finances an automobile dealer that is in the business of selling and leasing its inventory of automobiles can perfect a security interest in all the automobiles by filing a financing statement but not by compliance with a certificate-of-title statute.").

A reasonable juror could find that Performance Plus was holding the Corvettes as inventory for sale and that, therefore, Fifth Third has a perfected security interest in the cars.

First, a reasonable juror could find that Performance Plus was a dealer in automobiles, and, more specifically, vintage or collectible Corvettes. The Certificate of Motor Vehicle Title Act defines "dealer" as including both a "new motor vehicle dealer" and a "used motor vehicle dealer." Ohio Rev. Code § 4505.13(H)(2) & Ohio Rev. Code § 4517.01(J). In turn, a "used motor vehicle dealer" is "any person engaged in the business of selling, displaying, offering for sale, or dealing in used motor vehicles, at retail or wholesale." Ohio Rev. Code § 4517.01(L). In this case, the complaint alleges that Performance Plus "was in the business of buying, restoring, and selling automobiles, especially Chevrolet Corvettes." Amended Compliant ¶ 3. Similarly, Plaintiff's deposition and affidavit indicate that Performance Plus bought and sold used

Corvettes. Therefore, a reasonable juror could conclude that Performance Plus was a "used motor vehicle dealer."

Second, a reasonable juror could conclude that Performance Plus was holding the Corvettes as inventory. "Inventory" means, inter alia, "goods, other than farm products that . . . are being held for sale or lease[.]" Ohio Rev. Code § 4505.13(H)(4) & Ohio Rev. Code § 1309.102(48)(b). Although Plaintiff's brief characterizes the Corvettes as being part of his collection for his personal use and enjoyment, his deposition testimony indicates otherwise. In his deposition, Plaintiff indicates that the Corvettes were "investment" cars, i.e., cars that were involved in his informal arrangement with Performance Plus to buy, restore, and re-sell Corvettes. Plaint. Dep. at 36-53. Additionally, Plaintiff's affidavit states that the Corvettes he purchased were generally available for sale or trade at Performance Plus. Plaint. Aff. ¶ 4. Accordingly, a reasonable juror could conclude that the Corvettes were being held as inventory by Performance Plus.

Noel Grace's affidavit denies that Performance Plus was holding the Corvettes as inventory. Doc. No. 37-2 ¶ 16. As Fifth Third accurately argues, however, based on the entire record, a reasonable juror could conclude that the Corvettes were acquired in the course of Plaintiff's agreement with Performance Plus to buy, restore, and re-sell Corvettes. Thus, a reasonable juror could conclude that the Corvettes were in inventory and available for sale by Performance Plus until Plaintiff learned that Performance Plus had defaulted on its floor plan agreement. As discussed further, infra at 15-17, a reasonable juror could conclude that the conveyance of the Corvettes to Plaintiff was fraudulent.

Since a juror could conclude that the Corvettes were being held as inventory by Performance Plus, the perfection provisions of § 1309.311(D) apply.  As already stated, a security interest in motor vehicles being held as inventory is perfected by filing a U.C.C. financing statement on the debtor's inventory.  Fifth Third perfected its security interest in Performance Plus's inventory by timely filing a U.C.C. financing statement.  Therefore, a reasonable juror could conclude that Fifth Third has a perfected security interest in the Corvettes.

### C. A Reasonable Juror Could Conclude that Plaintiff was not a Buyer of the Corvettes in the Ordinary Course of Business

Plaintiff argues that even if Fifth Third has a perfected security interest in the Corvettes, he was a buyer in the ordinary course of business of the Corvettes and, therefore, extinguished Fifth Third's security interest in them.  A buyer of goods in the ordinary course of business takes free of a perfected security interest in the goods created by his seller.  Ohio Rev. Code § 1309.320(A).  A "buyer in ordinary course of business" means:

> a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind.  A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under Chapter 1302 of the Revised Code may be a buyer in ordinary course of business. "Buyer in ordinary course of business" does not include a person that acquires goods in a transfer in

13

bulk or as security for or in total or partial satisfaction of a money debt.

Ohio Rev. Code § 1301.201(B)(9) (emphasis added).[2]

There are three problems with Plaintiff's contention that he was a buyer of the Corvettes in the ordinary course of business.  First, although Plaintiff adduced evidence showing wire transfers of cash to Performance Plus, at least two of the certificates of title indicate $0 as the purchase price of the car.  Complaint Exs. A & C.  In order to be a buyer in the ordinary course of business, however, the purchaser must give some value for the goods.  See Ohio Rev. Code § 1301.201(9) ("A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale."); Ohio Rev. Code § 1302.01(A)(11)("A 'sale' consists in the passing of title from the seller to the buyer for a price.") (emphasis added); see also Ohio Rev. Code §

---

[2]     Plaintiff has argued that he is a buyer in the ordinary course of business pursuant to Ohio Rev. Code § 1309.209(B).  Fifth Third has argued that Plaintiff cannot be a buyer in the ordinary course of business under this section because he bought the Corvettes as investments and not for household or personal use.  Section 1309.209 is Ohio's codified version of U.C.C. § 9-320.   As explained by White and Summers, § 9-320(B) is for sales "by amateurs to amateurs."  4 JAMES J. WHITE, ET. AL., UNIFORM COMMERCIAL CODE § 33-8 (6th ed. 2012).  Section 9-320(B) only applies when the seller used the goods primarily for personal, family, or household purposes and the buyer intends to use the goods primarily for personal, family, or household purposes.  Id.  This section does not apply if the seller is in the business of selling goods of the kind.  Id.  In this case, regardless of whether Plaintiff bought the Corvettes for personal use or as an investment, § 1309.320(B) would not apply to determine Plaintiff's buyer in the ordinary course of business status because the alleged seller of the Corvettes to Plaintiff, Performance Plus, was a seller of goods of the kind.  In other words, Performance Plus was in the business of selling Corvettes; it did not own the Corvettes primarily for personal, family or household purposes.  Plaintiff, nevertheless, could still be a buyer in the ordinary course of business under § 1301.201(B)(9) and/or § 1309.320(A).  In any event, § 1309.320 does not actually define who is a buyer in the ordinary course of business; rather, it only provides the rule that a buyer in the ordinary course of business takes free of a security interest created by his seller.

4505.07(B)(12) (requiring the purchase price of the motor vehicle to be reflected on the face of the certificate of title). Viewing the record in the light most favorable to Fifth Third, these certificates of title indicate that Plaintiff did not give value for at least two of the Corvettes. Additionally, as Fifth Third points out in its memorandum in opposition, Plaintiff has not adduced any bills of sale evidencing a purchase of the Corvettes from Performance Plus. A reasonable juror could conclude from these facts that Plaintiff did not give value to Performance Plus for the Corvettes.

Second, as Fifth Third correctly points out, Plaintiff never took possession of the Corvettes - indeed, he has never actually even seen them. Plaint. Dep. at 11, 26, 36. Therefore, Plaintiff's failure to take possession of the Corvettes arguably disqualifies him from being a "buyer in the ordinary course of business." But see Ace Equip. Sales, Inc. v. H.O. Penn Mach. Co., Inc., 871 A.2d 402, 406 (Conn. Ct. App. 2005) (buyer was buyer in the ordinary course of business, despite failure to take physical possession of rock crusher, because custom of the industry was not to take physical possession of heavy equipment because of prohibitive cost of transportation); In re Havens Steel Co., 317 B.R. 75, 87-88 (Bkrtcy.W.D.Mo. 2004) (constructive possession sufficient to confer "buyer in the ordinary course of business" status).

Plaintiff contends that he was a buyer in the ordinary course of business, even though he did not take actual possession of the Corvettes, because he had the right to take possession of the Corvettes from Performance Plus. Plaintiff cites for this proposition § 1301.201(9) where it states that a purchaser may be a buyer in the ordinary course of business when he has "the right to recover the goods from the

seller."  A full reading of this clause, however, shows that it is not conferring buyer in the ordinary course of business status on a purchaser who has a generalized right to take possession of the goods, which is what Plaintiff argues.  Rather, § 1301.201(9) states that a purchaser may be a buyer in the ordinary course of business where he has "a right to recover the goods from the seller under Chapter 1302."  Ohio Rev. Code 1301.201(9) (emphasis added).  In turn, the Official Comments to § 1301.201(9) indicate that "the right to recover the goods from the seller" is a term of art.  The commentary states: "Concerning when a buyer obtains possessory rights, see Sections 2-502 and 2-716." Ohio Rev. Code § 1301.201, Official Comment 9.  In other words, according to these provisions, in order to be a buyer in the ordinary course of business without taking possession of the goods, the buyer must have the right to recover the goods from the seller under either U.C.C. 2-502 or U.C.C. 2-716.  See 1 JAMES J. WHITE, ET. AL., UNIFORM COMMERCIAL CODE § 1:8 (6th ed. 2012) ("A court may still find that the buyer 'has the right to recover the goods from the seller under Article 2.' Buyers may recover goods from seller under §§ 2-502(1)(b) and 2-716(1), (3)).").

In turn, U.C.C. § 2-502 provides the buyer a right to recover the goods where the seller repudiates the sales contract and maintains possession of goods after the buyer makes a down payment for goods.  U.C.C. § 2-716 provides the buyer a right to specific performance or replevin of the goods upon breach of contract by seller.  These sections are not applicable in this case, however, because Performance Plus did not retain possession of the Corvettes in breach of a contract to sell them to Plaintiff.  Plaintiff is not a buyer in the ordinary course of business merely because he could have taken

16

possession of the Corvettes from Performance Plus whenever he desired.

Third, a buyer in the ordinary course of business only takes free of a security interest created by his seller.  Ohio Rev. Code § 1309.320(A).   In this case, while the evidence shows that Performance Plus created the security interests in the Corvettes, Plaintiff did not buy the Corvettes from Performance Plus.  Rather, the evidence shows that Performance Plus located sellers of Corvettes for Plaintiff and bought or traded for Corvettes from third-parties on his behalf.  Plaint. Aff. ¶ 3.  Stated another way, Performance Plus acted as Plaintiff's purchasing agent for the Corvettes.  Plaintiff's affidavit in fact states that he bought Corvettes through Performance Plus and not from Performance Plus.  Id. ¶ 4; see also id. ¶ 8 (stating that Performance Plus bought vehicles on his behalf).  Thus, the record shows that the actual sellers of the Corvettes to Plaintiff were third parties, not Performance Plus.  Since Performance Plus, and not the actual sellers of the Corvettes, created the security interests in the Corvettes, Plaintiff was not a buyer of the Corvettes in the ordinary course of business from Performance Plus. See United States v. Continental Grain Co., 691 F. Supp. 1193, 1198 (W.D.Wis. 1988) ("[T]he buyer loses this protection [buyer in the ordinary course of business] where the buyer purchases farm products from a person engaged in farming operations, or where the buyer's seller did not create the security interest in the goods sold.") (emphasis added). While Plaintiff might be a buyer of the Corvettes in the ordinary course of business vis-à-vis the third parties, a reasonable juror could find that he was not a buyer of the Corvettes from Performance Plus in the ordinary course of

17

business.[3]

D. <u>A Reasonable Juror Could Conclude that Performance Plus
Fraudulently Transferred the Corvettes to Plaintiff</u>

Fifth Third argues that its security interest in the Corvettes was not extinguished

_____

[3]     Although Plaintiff gave value to Performance Plus for it to acquire the Corvettes
on his behalf, he cannot claim any ownership of the cars prior to August 10, 2009
because they were titled to Performance Plus.  <u>Allan Nott Enter., Inc. v. Nicholas Starr
Auto, L.L.C.</u>, 851 N.E.2d 479, 482 (Ohio 2006) ("R.C. 4505.04 provides that a person
must possess a certificate of title to claim ownership of a motor vehicle.").  Plaintiff's
status prior to August 10, 2009 was that of a holder of a purchase money security
interest in the Corvettes because he gave value to Performance Plus to acquire rights in
the Corvettes.  <u>See</u> Ohio Rev. Code § 1309.05 ("A security interest is a 'purchase
money security interest' to the extent that it is . . . taken by a person who by making
advances or incurring an obligation gives value to enable the debtor to acquire rights in
or the use of collateral if such value is in fact so used.").  As already stated, the record
viewed in the light most favorable to Fifth Third shows that Performance Plus held the
Corvettes as inventory for sale. The record does not show, however, that Plaintiff took
the necessary steps to perfect a purchase money security interest in the Corvettes,
which <u>he</u> would had to have done with a notation on the certificate title or by having an
electronic entry of the lien entered by the clerk of court.  Ohio Rev. Code § 4505.13(B);
<u>see</u> <u>supra</u>, at 9 ("[T]he Certificate of Motor Vehicle Title Act requires a security interest
in a motor vehicle to be perfected by either noting the lien on the title itself or by
electronically entering the lien with the clerk of court.").  Additionally, since Plaintiff held
a purchase money security interest, he would have had to give Fifth Third notice of his
security interest in the Corvettes as well.  <u>See</u> <u>Absolute Mach. Tools, Inc. v. Liberty
Precision Ind., Ltd.</u>, No. 08CA009203, 2009 WL 2858092, at *2-*4 (Ohio Ct. App. Sept.
8, 2009)(in order to perfect a purchase money security interest in the same collateral,
secured party must file a financing statement and give notice to other creditors of its
conflicting security interest).  Therefore, Fifth Third's prior perfected security interest in
Performance Plus's inventory would take priority over Plaintiff's unperfected purchase
money security interest in the Corvettes.  <u>See id.</u> at *4 ("Because the evidence was
undisputed that Absolute failed to notify Chase of its purchase money security interest
in the 11 machines before Liberty received possession of them, it failed to comply with
the notice requirements of R.C. 1309.324 and Absolute's purchase money security
interest did not have priority over Chase's blanket security interest in Liberty's
inventory.").  The Court has just addressed the problems concerning Plaintiff's status as
a buyer of the Corvettes in the ordinary course of business.  As stated, viewed in the
light most favorable to Fifth Third, Plaintiff was not a buyer in the ordinary course of
business.  Thus, for purposes of summary judgment, Fifth Third's security interest in the
Corvettes was not extinguished by the transfer of the titles to Plaintiff.

when Performance Plus transferred the titles to Plaintiff because the transfers were fraudulent conveyances. Among other remedies, a creditor may obtain avoidance of a fraudulent transfer. Ohio Rev. Code § 1336.07(A)(1).

Regarding fraudulent transfers, the Ohio Revised Code provides:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

(B) In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the assets of the debtor;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

19

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Ohio Rev. Code. § 1336.04.   A reasonable juror could find that Performance Plus fraudulently transferred the Corvettes to Plaintiff pursuant to subsection (A)(1), i.e., conveyed them with the intent to hinder, delay, or defraud Fifth Third.

First, the evidence shows that Performance Plus was insolvent at the time of the transfer of the Corvettes to Plaintiff because it had defaulted or was about to default on its floor plan agreement with Fifth Third.  See Ohio Rev. Code § 1336.04(B)(9); Ohio Rev. Code § 1336.02(A)(2) ("A debtor who generally is not paying his debts as they come due is presumed to be insolvent.").

Second, Performance Plus retained possession of the Corvettes even after the transfer of the titles to Plaintiff.  Ohio Rev. Code § 1336.04(B)(2).

Third, the evidence suggests that Plaintiff was an "insider" and, thus Performance Plus transferred the Corvettes to an insider.  Ohio Rev. Code § 1336.04(B)(1).   An "insider" includes a general partner of a partnership in which the debtor is also a general partner.  Ohio Rev. Code §§ 1336.01(G)(2)(d) & (e).  In this case, as already discussed, the evidence suggests that Plaintiff and Performance Plus were in a partnership, however informal, in which Plaintiff contributed capital and

20

Performance Plus contributed its skill and labor, to buy, restore, and re-sell collectible Corvettes for a profit to be split evenly between them.  See DiPasquale v. Costas, 926 N.E.2d 682, 705 (Ohio Ct. App. 2010)("Partnership contracts also need not be in writing, but may be proven by showing acts and conduct of the parties from which the fact may be inferred that the parties have agreed to become partners.") (internal quotation marks omitted); Garrison v. Place, 109 N.E.2d 569, 571 (Ohio Ct. App. 1952) (sharing of profits, though not dispositive, is strong evidence of a partnership).  The fact that Plaintiff admits that Performance Plus was authorized to buy, sell, or trade Corvettes on his behalf also supports the position that a partnership was formed.  Id. (partnership requires that each partner have express or implied authority to bind the other).  Additionally, the evidence suggests that the Corvettes at issue in this case were acquired during the course of the partnership.  Therefore, a reasonable juror could conclude that Performance Plus transferred the Corvettes to an insider.

While not dispositive, the evidence supporting these three factors is sufficient to create a jury question as to whether the transfer of the Corvettes to Plaintiff was fraudulent for purposes of § 1336.04.  Compare with Profeta v. Lombardo, 600 N.E.2d 360, 364-65 (Ohio Ct. App. 1991) (finding of three "badges of fraud" supported trial court's determination that conveyances were fraudulent).

### E. Order of Immediate Possession

Plaintiff also moves the Court for an order of immediate possession of the Corvette's pursuant to Ohio Rev. Code § 2737.01, et seq.  In order to be entitled to an order of immediate possession, the movant must demonstrate that he is likely to obtain

a judgment which will result in permanent possession of the personal property at issue. Ohio Rev. Code § 2737.01(C).  If the defendant has a competing right to the property, the plaintiff is not entitled to a writ of possession.  Kreuzer v. Scott, Case No. 14840,1995 WL 118168, at *1 (Ohio Ct. App. Mar. 8, 1995).  As just discussed, viewing the record in the light most favorable to Fifth Third, it has a valid and perfected security interest in the Corvettes entitling it to possession of the Corvettes by virtue of Performance Plus's default.

Accordingly, Plaintiff is not entitled to an order of immediate possession of the Corvettes.

### F. Fifth Third's Cross-Motion for Summary Judgment

Fifth Third's memorandum in opposition to Plaintiff's motion for summary judgment also purports to assert a cross-motion for summary judgment in its favor on each of Plaintiff's claims as well as its counterclaims.  Fifth Third's motion for summary judgment is not well-taken for two reasons.

First, the motion is out of time.  The dispositive motion deadline established by Court was July 16, 2012.  Fifth Third did not move for summary judgment until August 30, 2012, and therefore missed the deadline by about six weeks.

Second, as the Court's discussion of Plaintiff's motion for summary judgment illustrates, there are numerous factual questions pending that preclude entering judgment in favor of Fifth Third.  Among other critical issues to be resolved are: 1) whether Plaintiff and Performance Plus created partnership for the purpose of buying, restoring and re-selling Corvettes; 2) if so, whether the Corvettes were acquired in the

22

course of the partnership's business; 3) whether the Corvettes were in Performance Plus's inventory; 4) whether Plaintiff was a buyer of the Corvettes in the ordinary course business; and 5) whether the transfer of the Corvettes to Plaintiff by Performance Plus was a fraudulent conveyance.

Accordingly, Fifth Third's motion for summary judgment is not well-taken and is **DENIED.**

## IV. The Magistrate Judge's Report and Recommendation

The substantial differences between the Court's analysis of the record and its opinion and Magistrate Judge Bowman's analysis of the record and her opinion should sufficiently indicate that Fifth Third's objections to the Report and Recommendation are well-taken.  They are, therefore, **SUSTAINED.**  The Court, therefore, does not adopt the Report and Recommendation.

## Conclusion

Plaintiff's replevin, conversion, and civil theft claims against Fifth Third are all based on the premise that its seizure of the Corvettes was wrongful.  However, viewed in the light most favorable to Fifth Third, the record shows that Fifth Third had perfected security interests in the Corvettes that were not extinguished by the transfer of the certificates of title to Plaintiff.  After a default by the debtor, the secured party has the right to take possession of the collateral.  Ohio Rev. Code § 1309.609(A)(1).  Therefore, after Performance Plus's default on the floor plan financing agreement, Fifth Third was authorized to take possession of the Corvettes.  Consequently, viewing the record in the light most favorable to Fifth Third, its seizure and continued possession of the Corvettes

was not wrongful.  See Bono v. McCutcheon, 824 N.E.2d 1013, 1018 (Ohio Ct.

App.2005) (conversion and replevin claims both require the wrongful exercise of control

over the plaintiff's property).

　　　　Accordingly, Plaintiff's motion for summary judgment is not well-taken and is

**DENIED.**

　　　　　　　**IT IS SO ORDERED**


Date November 29, 2012 　　　　　　　　　　　 s/Sandra S. Beckwith
　　　　　　　　　　　　　　　　　　　　Sandra S. Beckwith
　　　　　　　　　　　　　　　　Senior United States District Judge